# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**DAVID JIMENEZ,**

     **Petitioner,**

**v.**                                 **Case No. 8:19-cv-684-MSS-AEP**

**SECRETARY, DEPARTMENT
OF CORRECTIONS,**

     **Respondent.**

_____/

## O R D E R

Jimenez petitions for a writ of habeas corpus under 28 U.S.C. § 2254 and challenges his state court convictions for scheme to defraud, criminal use of personal identification information, and providing a false name to law enforcement, for which he is serving 15 years of prison. (Docs. 6 at 1 and 13-3 at 612–17) After reviewing the amended petition (Docs. 6 and 7), the response and appendix (Doc. 13), and the reply (Docs. 14 and 15), the Court **DENIES** the petition.

## PROCEDURAL HISTORY

A jury found Jimenez guilty of the crimes, and the trial court sentenced Jimenez to 15 years of prison for one count of criminal use of personal identification, a concurrent 5 years of prison for the second count, 5 years of probation for scheme to defraud, and time served for providing a false name to law enforcement. (Doc. 13-3 at 607–10, 612–19) The state appellate court affirmed the convictions and sentences. (Doc. 13-3 at 682) The post-conviction court denied Jimenez relief (Doc. 13-4 at 258–78), and the state appellate court affirmed. (Doc. 13-4 at 604) Jimenez's federal petition follows.

1

## FACTS

Sandra Rhodes met Jimenez on a dating website. When Rhodes told Jimenez that she owed money to the Internal Revenue Service, Jimenez agreed to help her. Rhodes gave Jimenez a tax form with her personal identification information. Jimenez gave Rhodes credit cards, explained that the accounts were in his name and he was responsible for expenses on the cards, and told her to use the cards for food and gasoline. Jimenez insisted that Rhodes upgrade her car. Rhodes agreed to purchase a Mercedes Benz in her name, after Jimenez promised to pay the car loan. Rhodes never drove the car, and Jimenez later asked Rhodes to sign some documents that Rhodes believed transferred title of the car to Jimenez. Also, Rhodes agreed to open a checking account at Bank of America for Jimenez. When Rhodes went to the bank, she discovered that she owed the bank $14,000.00 on a credit card. Rhodes had not applied for the Bank of America credit card and never knew that the card existed. Someone had used the card for purchases in Puerto Rico, and Rhodes had never traveled to Puerto Rico. Rhodes also learned that she was the primary cardholder for the credit cards that Jimenez gave her. Rhodes learned about unauthorized purchases on those cards and on other cards in her name at restaurants, bars, hotels, airlines, and Disney World. Also, Rhodes learned that someone had applied for other credit cards in her name, even after her relationship with Jimenez ended, but the credit card companies suspected fraud and denied the applications.

The car lender for the Mercedes Benz notified Rhodes that Jimenez stopped making payment on the car loan, and Rhodes contacted police. Jimenez surrendered to Rhodes the Mercedes Benz, which appeared damaged, and Rhodes returned the car to the lender. The credit card companies discharged the unauthorized purchases on the credit cards. Rhodes

filed for bankruptcy to discharge a $15,000.00 debt for the Mercedes Benz. When Jimenez surrendered the car, a sheriff's deputy spoke with Jimenez. Jimenez first told the deputy that his name was "Michael David Jimenez," but then told the deputy his name was "Michael Paul Jimenez." Both an expired Florida driver's license and a valid Texas driver's license showed Jimenez's name as "Michael Paul Jimenez." A detective learned that "Michael Jimenez" was Jimenez's brother who lived in Texas.

During his relationship with Rhodes, Jimenez met Elizabeth Gonzalez in Tampa at a coffee shop.[1] Jimenez never mentioned his relationship with Rhodes. Jimenez used credit cards to treat Gonzalez to expensive meals at nice restaurants, purchase gifts for her and her family, purchase gifts for her children at Disney World, and pay for plane tickets and hotels for Gonzalez. Jimenez asked Gonzalez to marry him, and both married at a "high-end" resort in Puerto Rico where Gonzalez lived. Jimenez paid for the wedding with a credit card.

Jimenez asked Gonzalez to move to Tampa to live with him and asked for her personal identification information to add her and her daughter to his health insurance. Jimenez gave Gonzalez a credit card in her name but told her that he opened the account in his name, was responsible for the charges, and authorized her to use the account. After Gonzalez moved to Tampa, a sheriff's deputy informed her that police were investigating Jimenez for fraud. Gonzalez discovered that she incurred $50,000.00 to $60,000.00 in debt on three credit cards. Gonzalez had not applied for the credit cards and had not authorized the purchases. Gonzalez also incurred $12,000.00 in debt in a savings account that belonged to her. Jimenez had asked

---

[1] The trial court admitted Gonzalez's testimony as similar fact evidence. (Doc. 13-2 at 168–70)

3

Gonzalez for the card for that account because he claimed that he had lost his cards. Gonzalez had not authorized purchases on that account either.

Rhodes provided the detective with her credit report and identified Jimenez as the person whom she believed responsible for the debts, and the detective subpoenaed documents from the credit card companies listed in the report. Records in the accounts in Rhodes's name showed Rhodes as the primary account holder and Jimenez as an authorized user. Two accounts listed Jimenez's e-mail address as a primary contact. Records for an account in Rhodes's name showed the purchase of airplane ticket for Gonzalez to Puerto Rico. Also, records for an account in Gonzalez's name showed payments for the wedding.

## STANDARDS OF REVIEW

### AEDPA

Because Jimenez filed his federal petition after the enactment of the Antiterrorism and Effective Death Penalty Act, AEDPA governs his claims. *Lindh v. Murphy*, 521 U.S. 320, 327 (1997). AEDPA amended 28 U.S.C. § 2254(d) to require:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the U.S. Supreme Court] on a question of law or if the state court decides a case differently than [the U.S. Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). A decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal principle from [the U.S. Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. Clearly established federal law refers to the holding of an opinion by the U.S. Supreme Court at the time of the relevant state court decision. *Williams*, 529 U.S. at 412.

"[AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 694 (2002). A federal petitioner must show that the state court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

**Ineffective Assistance of Counsel**

Jimenez asserts ineffective assistance of counsel — a difficult claim to sustain. *Strickland v. Washington*, 466 U.S. 668, 687 (1984) explains:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's

errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

"There is no reason for a court . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690.

 "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. To demonstrate prejudice, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 691. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

*Strickland* cautions that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690–91. A defendant cannot meet his burden by showing that the avenue chosen by counsel was unsuccessful. *White v. Singletary*, 972 F.2d 1218, 1220–21 (11th Cir. 1992).

Because the standards under *Strickland* and AEDPA are both highly deferential, "when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105. "Given the double deference due, it is a 'rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas

proceeding.'" *Nance v. Warden, Ga. Diag. Prison*, 922 F.3d 1298, 1303 (11th Cir. 2019) (citation omitted).

The state appellate court affirmed in a decision without a written opinion the post-conviction court's order denying Jimenez relief. (Doc. 13-4 at 604) A federal court "'look[s] through' the unexplained decision to the last related state-court decision that does provide a relevant rationale [and] presume[s] that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). The post-conviction court provided reasons for denying Jimenez's claims in a written order. (Doc. 13-4 at 258–78)

**Exhaustion and Procedural Default**

A petitioner must exhaust the remedies available in state court before a federal court can grant relief on habeas. 28 U.S.C. § 2254(b)(1)(A). The petitioner must (1) alert the state court to the federal nature of his claim and (2) give the state court one full opportunity to resolve the federal claim by invoking one complete round of the state's established appellate review process. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *Picard v. Connor*, 404 U.S. 270, 278 (1971). The state court must have the first opportunity to review and correct any alleged violation of a federal right. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004).

A federal court may stay — or dismiss without prejudice — a habeas case to allow a petitioner to return to state court to exhaust a claim. *Rhines v. Weber*, 544 U.S. 269 (2005); *Rose v. Lundy*, 455 U.S. 509 (1982). If the state court would deny the claim on a state procedural ground, the federal court instead denies the claim as procedurally barred. *Snowden v. Singletary*, 135 F.3d 732, 736 (11th Cir. 1998) (citing *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991)).

To excuse a procedural default on federal habeas, a petitioner must demonstrate either (1) cause for the default and actual prejudice from the alleged violation of federal law or (2) a miscarriage of justice. *Maples v. Thomas*, 565 U.S. 266, 280 (2012); *House v. Bell*, 547 U.S. 518, 536–37 (2006).

## ANALYSIS

### Ground One

Jimenez asserts that the admission of records at trial violated the state rules of evidence (Doc. 6 at 5), and trial counsel was ineffective for stipulating to the admission of the records. (Doc. 7 at 3) The Respondent asserts that the ground is unexhausted and procedurally barred. (Doc. 13 at 5) Jimenez contends that he raised the claim in his motion for post-conviction relief. (Doc. 6 at 6) Jimenez raised the claim in his post-conviction motion (Doc. 13-4 at 181–85) and his brief on post-conviction appeal. (Doc. 13-4 at 520) The Respondent overlooked the ineffective assistance of counsel component of the claim in Ground One on page 2 of Jimenez's memorandum supporting his Section 2254 petition and misconstrued the ground as raising a due process claim. (Doc. 7 at 3) *Dye v. Hofbauer*, 546 U.S. 1, 4 (2005). Consequently, Jimenez adequately exhausted the claim. *Boerckel*, 526 U.S. at 845; *Picard*, 404 U.S. at 278.

The post-conviction court denied the claim as follows (Doc. 13-4 at 267–72) (state court record citations omitted):

> Defendant's claim alleges that his counsel was ineffective for stipulating to waive the production of an authenticating witness and for failing to challenge "documentary evidence used to convict" him. He contends that the documentary evidence he identifies throughout his claim, which appears to consist of all bank records, credit card applications, America Online account information, cell phone records, and a police-created visual aid submitted at trial, were not properly authenticated, consisted of

unduly prejudicial hearsay, did not meet the standards of admissibility, and contained "unduly prejudicial surplusage" that related to the ultimate issues of the trial and determined the outcome. He argues that a witness was required to identify documents that are not self-authenticating and "if the basis for authenticity is that the documents are self-authenticating the requirements of admissibility must be exactly adhered to." He alleges that one exhibit admitted as evidence as State's Exhibit 14 was created by an investigating officer and used in his prosecution rather than in the normal course of business, and Detective Bingham's testimony listed in pages 8 through 9 of his third amended motion regarding State's Exhibit 14 "was prejudicial surplusage in light of the inauthentic evidence." He asserts that counsel failed to review these documents in advance of trial and therefore "unqualified statements of wrongdoing" were placed before the jury without the benefit of cross-examination. Defendant asserts that if counsel had reviewed these documents and objected to the admissibility of the documentary evidence he describes, the documents would not have been admissible and the outcome of the trial would have been different. The State was directed to respond to this claim.

In its response, the State argues that counsel's failure to challenge documentary evidence presented by the State at the *Williams* Rule hearing and at trial was reasonable, because the evidence was admissible pursuant to Section 90.902(11), Florida Statutes, as self-authenticating, and fell under the "Record of Regularly Conducted Business Activity" exception in Section 90.803(6), Florida Statutes. The State asserts that prior to the *Williams* Rule hearing, the State introduced Exhibits 1 through 5 as evidence, which consisted of reports, records, and data compilations made at or near the time by, or from information transmitted by, a person with knowledge, kept in the course of regular practice of that business activity to make such reports, records, or data compilation, as shown by a certification or declaration that complies with paragraph (c) and Section 90.902(11), Florida Statutes. The State placed on the record that it had previously filed a notice of intent to offer records of regularly conducted business activity by certification and declaration in accordance with Section 90.803(6)(c), and that each exhibit was introduced with an affidavit that the exhibit was made at or near the time the offenses occurred and was kept in the course of regularly conducted activity in accordance with Section 90.902(11), Florida Statutes.

The State further argues that State's Exhibit 14, along with all other records and reports it presented, were presented with a certificate of domestic records of regularly conducted business, and fell within the hearsay exception described above. The State alleges that the requirements of self-authenticating documents were exactly adhered to, and therefore a records custodian was not required to testify and introduce the exhibits at trial. Thus, the State argues that counsel's failure to object was reasonable. The State also notes that the documents presented by the State were not "highly prejudicial surplusage" as Defendant claims, as each document pertained to a material issue at trial and proved Defendant's scheme to defraud and his unauthorized use of Ms. Rhodes's personal information.

Finally, the State argues that even if counsel reviewed all of the documents and objected to their admission, there is no reasonable probability that the objection would have been sustained. The State asserts that it filed a notice of intent in compliance with Section 90.803(6), Florida Statutes, three years prior to trial, each exhibit was accompanied by a certificate of authenticity from the records custodians, and all exhibits were admissible under Section 90.902(11), Florida Statutes. The State therefore argues that there is no reasonable probability that the *Williams* Rule hearing or the trial would have been different if counsel had objected.

The Court is persuaded by the State's response, and finds that counsel was not deficient for failing to secure a document witness or failing to object or challenge documentary evidence, because the documentary evidence Defendant challenges was self-authenticating and admissible pursuant to the business records exception to hearsay. *See* §§ 90.803(6) [and] 90.902(11), Fla. Stat. A record of regularly conducted business activity is a[:]

> memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinion, or diagnosis, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity and if it was the regular practice of that business activity to make such memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, or as shown

by a certification or declaration that complies with paragraph (c) and section 90.902(11) . . . .

§ 90.803(6)(a), Fla. Stat. "[T]o secure the admissibility of evidence under the business records exception, the proponent of the evidence must show that: (1) the record was made at or near the time of the event; (2) the record was made by, or from information transmitted by, a person with knowledge; (3) the record was kept in the ordinary course of a regularly conducted business activity; and (4) it was a regular practice of that business to make such a record." *Morrill v. State*, 184 So. 3d 541, 545 (Fla. 1st DCA 2015) (citing *Yisrael v. State*, 993 So. 2d 952, 956–57 (Fla. 2008)). "The proponent of the evidence must present this information in one of three formats: (1) testimony of a records custodian, (2) stipulation by the parties, or (3) a certification or declaration that complies with sections 90.803(6)(c) and 90.902(11)." *Id.* A party offering evidence of records of regularly conducted business activity by means of a certification or declaration "shall serve reasonable written notice of that intention upon every other party and shall make the evidence available for inspection sufficiently in advance of its offer in evidence to provide to any other party a fair opportunity to challenge the admissibility of the evidence." § 90.803(6)(c), Fla. Stat.

Here, the State offered evidence of the business records by means of a certification or declaration that complied with Sections 90.803(6)(c) and 90.902(11), Florida Statutes. On April 28, 2010, three years prior to the *Williams* Rule hearing and trial, the State filed its Notice of Intent to Offer Records of Regularly Conducted Business Activity by Certification or Declaration in accordance with Section 90.803(6)(c), Florida Statutes. That same day, the State filed an "Acknowledgment of Additional Tangible Evidence." In the acknowledgment, each piece of record evidence from a bank or financial institution indicates that it includes a Certificate of Business Records.

The State introduced five exhibits at the *Williams* Rule hearing, which consisted of copies of various bank and credit card records. Each exhibit was accompanied by an affidavit from the records custodian certifying that the record was made at or near the time of the occurrence of the offenses and was kept and made in the course of regularly conducted activity, in accordance with Section 90.902(11), Florida Statutes. With regard to the exhibits, prior to the start of the *Williams* Rule hearing, the State placed on the record that:

[Prosecutor:]        [B]ack on April 26th of 2010 the State filed a notice of intent to offer records of regularly conducted business activity by certification and declaration. Included in that is State's Exhibit 1, State's Exhibit 2, and State's Exhibit 3. Not included are State's Exhibit 4 and State's Exhibit 5. State's Exhibit 4 and State's Exhibit 5[,] I'm moving at this point into evidence under Florida Statute 90.902(11), self-authenticating. These documents have a business record affidavit indicating that they are kept in the normal course of business and made out or about the time that — it's got all the factors. It was made at or about the time of the offense — or the record was made. It was kept in the normal course of business and it's a practice to keep these, and it's made by somebody with knowledge. It was signed and notarized in the states where these companies are located. So I would submit these as self-authenticating; State's 1, 2, 3, 4, and 5. I would submit them [as] self-authenticating with the affidavits. They all have the affidavits.

Therefore, the record reflects that the documentary evidence met the standards of admissibility and that the procedure for admitting self-authenticating business records pursuant to the business record exception was exactly adhered to at the *Williams* Rule hearing; therefore, a document witness was not necessary and counsel had no basis to object to the admission of the evidence at the *Williams* Rule hearing. Counsel cannot be deemed ineffective for failing to raise a meritless objection. *See Schoenwetter v. State*, 46 So. 3d 535, 546 (Fla. 2010).

Additionally, the State introduced 20 exhibits at trial, which consisted largely of copies of various bank and credit card records. Again, each exhibit entered as evidence [of] a business

record [and] was accompanied by an affidavit from the records custodian certifying that the record was made at or near the time of the occurrence of the offenses and was kept and made in the course of regularly conducted activity, in accordance with Section 90.902(11), Florida Statutes. With regard to the exhibits at trial, during its opening statement, counsel for the State stated that "what you're also going to see [are] bank records. You're going to see — and nobody from the banks [is] going to testify about [them] because they provided affidavits which you're also going to get as well saying the records were authentic and that they're kept in the normal course of business. They're business records basically, and that's why they're reliable." Further, the State affirmed that each exhibit qualified as a business record prior to admitting it as evidence during the trial. Therefore, the record reflects that the documentary evidence met the standards of admissibility and that the procedure for admitting self-authenticating business records pursuant to the business record exception was exactly adhered to at trial. Thus, a document witness was not necessary and counsel had no basis to object to the admissibility of the evidence at trial, which counsel acknowledged. Counsel cannot be deemed ineffective for failing to raise a meritless objection. *See Schoenwetter*, 46 So. 3d at 546.

The Court notes that Defendant's motion more specifically references State's Exhibit 14, a business record from Discover card. Like all of the documentary evidence discussed herein, Exhibit 14 was admitted pursuant to the business records exception as self-authenticating, and the State specially stated that Exhibit 14 was "a record from Discover card including a screen shot for an application and a business records certification." Defendant refers to Detective Bingham's testimony at trial as "unduly prejudicial surplusage in light of inauthentic evidence[,]" however, the evidence was self-authenticating and admissible pursuant to the business records exception. *See* §§ 90.803(6) [and] 90.902(11), Fla. Stat.

Furthermore, the testimony was relevant and not "unduly prejudicial surplusage" as Defendant claims. "Relevant evidence is evidence tending to prove or disprove a material fact." § 90.401, Fla. Stat. All relevant evidence is admissible unless specifically excluded by law. *See* § 90.402, Fla. Stat. The testimony Defendant references is Detective Bingham's testimony interpreting the information in the business record exhibit for the jury. Detective Bingham explained that the Discover corporate investigator provided screen shot information of what their servers capture when someone

requests a credit card, which includes the date the application was received, Ms. Rhodes's name, address, and contact information, and also listed Defendant as the authorized buyer. It listed the email account associated with the account, "DAVJIMEN4@AOL.COM," and the phone number for the application. Therefore, Exhibit 14, like all of the exhibits at trial, was not "unduly prejudicial surplusage," and was relevant to prove a material issue in Defendant's scheme to defraud and unauthorized use of Ms. Rhodes's personal information. Thus, counsel had no basis to object, and counsel cannot be deemed ineffective for failing to raise a meritless objection. *See Schoenwetter*, 46 So. 3d at 546.

In light of the foregoing, Defendant has failed to meet either prong of *Strickland*. Counsel was not deficient for failing to secure a document witness or failing to object or challenge documentary evidence at trial, because all of the documentary evidence that Defendant now challenges was relevant, self-authenticating, and admissible pursuant to the business records exception to hearsay, and the "requirements of admissibility" were adhered to. *See* §§ 90.803(6) [and] 90.902(11), Fla. Stat. Defendant was not prejudiced, because if counsel had objected, the objection would have been overruled because the documents were admissible. *See id.* Therefore, there is no reasonable probability that the outcome of the trial would have been different if counsel had objected to or challenged the documentary evidence at trial, and this claim is denied.

Whether the trial court appropriately admitted the documents under the business records exception to hearsay is an issue of state law, and a state court's determination of state law receives deference in federal court. *Machin v. Wainwright*, 758 F.2d 1431, 1433 (11th Cir. 1985). The state court record reflects that the prosecution timely notified the defense of its intent to introduce at trial under the business records exception to the hearsay rule the records from credit card companies, banks, a telephone company, a website, and an internet provider. (Doc. 13-4 at 468–69) To comply with the rules of discovery, the prosecution notified the defense of receipt of the records with certificates. (Doc. 13-4 at 470–71) At both the pretrial hearing concerning similar facts evidence and the trial, the

prosecution introduced into evidence the records under the business records exception. (Doc. 13-4 at 315–16, 322, 329, 334, 340–41, 374–75, 409, 411, 413, 475–76) At trial, a detective testified that an investigator with Discover Card sent him records concerning an account in Rhodes's name. (Doc. 13-4 at 437) After receipt of those records, the detective subpoenaed the records from Discover Card (Doc. 13-4 at 437), and the prosecutor introduced into evidence those subpoenaed records under the business records exception. (Doc. 13-4 at 341–42)

Under state law, the records were both self-authenticating and admissible under the hearsay exception. §§ 90.803(6) and 90.902(11), Fla. Stat. The records were relevant to prove that Jimenez unlawfully applied for credit cards in Rhodes's name and used those credit cards without her permission. §§ 90.401 and 90.402, Fla. Stat. Because an objection to the records would not have succeeded, trial counsel was not ineffective and the state court did not unreasonably deny the claim. *Pinkney v. Sec'y, Dep't Corrs.*, 876 F.3d 1290, 1297 (11th Cir. 2017) ("[A]n attorney will not be held to have performed deficiently for failing to perform a futile act, one that would not have gotten his client any relief.").

Ground One is **DENIED**.

**Ground Two**

Jimenez asserts that the state court violated his right to compulsory process and the right to be informed of the nature and cause of the accusations. (Doc. 6 at 7–8) He contends that the "arrest affidavit has no statements of charge[s] proffered against Jimenez or [ ] the writs or judicial means by which he [was] brought to answer." (Doc. 6 at 7)  He further contends that "no document [or] arrest affidavit [ ] state[s] [the] nature of [the] cause of Jimenez's arrest [on] January 6, 2009." (Doc. 6 at 7) The Respondent asserts that the ground

is unexhausted and procedurally barred. (Doc. 13 at 5) Jimenez contends that he raised the claim in his motion for post-conviction relief. (Doc. 6 at 7–8)

Jimenez did not raise the claim in his post-conviction motion (Doc. 13-4 at 175–224) and raised the claim for the first time in his brief on post-conviction appeal. (Doc. 13-4 at 519–20)  Because a defendant cannot raise a claim for the first time on post-conviction appeal in a Florida court, Jimenez failed to exhaust his available state court remedies. *Mendoza v. State*, 87 So. 3d 644, 660 (Fla. 2011). *Accord Harris v. Sec'y, Fla. Dep't Corrs.*, 709 F. App'x 667, 668 (11th Cir. 2018) (citing *Castille v. Peoples*, 489 U.S. 346, 351 (1989)).

If Jimenez returned to state court to exhaust the claim, the state court would deny the claim as untimely, successive, and procedurally barred. Fla. R. Crim. P. 3.850(b), (c), (h). Because Jimenez shows neither cause and actual prejudice nor a miscarriage of justice, the claim is procedurally barred from federal review. *Snowden*, 135 F.3d at 736.

Even so, a charging document must "contain[ ] the elements of the offense intended to be charged, and sufficiently apprise[ ] the defendant of what he must be prepared to meet." *Russell v. United States*, 369 U.S. 749, 763–64 (1962) (internal quotations and citations omitted). The information contained the elements of all four crimes charged, cited the relevant statute for each crime, alleged the dates when the crimes occurred and the locations where the crimes occurred, and identified the name of the victim if appropriate. (Doc. 13-2 at 18–19) Because the information provided Jimenez sufficient notice of the crimes charged, he is not entitled to relief. *United States v. Resendiz-Ponce*, 549 U.S. 102, 107–08 (2007) (citing *Hamling v. United States*, 418 U.S. 87, 119 (1974)).[2]

---

[2] The federal constitutional right to compulsory process guarantees a defendant "'compulsory process for obtaining *witnesses in his favor*.'" *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982) (italics in original) (citing U.S. Const. amend VI). Because Jimenez identifies no excluded witness

Ground Two is **DENIED**.

**Ground Three**

Jimenez asserts that an expert would have testified that the documents admitted into evidence were "improperly generated" (Doc. 6 at 8–7), and trial counsel was ineffective for stipulating to the admission of the documents instead of presenting testimony by the expert. (Doc. 7 at 14–16) The post-conviction court denied the claim as follows (Doc. 13-4 at 235–36):

> Defendant alleges that his counsel was ineffective for failing to secure a computer or IT expert to testify. To establish a facially sufficient claim of failure to call a witness, a defendant must provide the identity of the prospective witness, the substance of the witness's testimony, an explanation about how the omission of this evidence prejudiced the outcome of the trial, and an assertion that the witness was available to testify. *See Barthel v. State*, 882 So. 2d 1054, 1054–55 (Fla. 2d DCA 2004) (citing *Nelson v. State*, 875 So. 2d 579, 582–83 (Fla. 2004)). However, with regards to a claim that an expert witness should have been retained to testify, a defendant need not name a specific expert in a named field of expertise. *See Terrell v. State*, 9 So. 3d 1284, 1289 (Fla. 4th DCA 2009). To establish prejudice, a defendant must show, based on the circumstances of the case, "'that there is a likelihood that the deficient conduct affected the outcome of the court proceedings.'" *Nelson*, 875 So. 2d at 583 (quoting *Smith v. State*, 445 So. 2d 323, 325 (Fla. 1983)). Defendant asserts that a computer expert would have testified as to how the credit card computer records were generated. Defendant contends that a computer expert would have testified that the credit card applications had been initiated from Ms. Rhodes's computer address. He further alleges that a computer expert would have testified "that the records were improperly generated in response to police investigatory action." Defendant contends that if his counsel had hired a computer expert to testify as to these alleged facts, the outcome of the trial would have been different.

---

whose testimony was relevant, material, and vital to his defense, his claim fails. *Valenzuela-Bernal*, 458 U.S. at 867.

Defendant is not entitled to relief on this claim because he has failed to demonstrate that he was prejudiced. Defendant argues that a computer expert would be able to testify that the credit card applications had been initiated from Ms. Rhodes['s] computer address. However, the expert would not be able to identify the user operating the computer. Ms. Rhodes testified that Defendant would visit her at her home, and that he would sometimes stay overnight. Therefore, even if a computer expert were able to testify that the credit card applications originated from Ms. Rhodes's computer, the expert would not be able to determine whether it was Defendant, who had access to the home, or Ms. Rhodes who filled out the applications. Further, Defendant's claim that a computer expert would testify that the records were improperly generated in response [to] a police investigation is speculative and therefore procedurally barred. *See Spencer*, 842 So. 2d at 63; *Bass*, 932 So. 2d 1170, 1172 (citing *Jones*, 845 So. 2d at 64). Consequently, Defendant has failed to establish that there is a likelihood that counsel's failure to hire a computer expert affected the outcome of the proceedings pursuant to *Nelson*, and Defendant's claim is denied.

Rhodes testified at trial that Jimenez stayed over at her home beginning in January 2008 until May 2008. (Doc. 13-4 at 296–98) Even if an expert could testify that the applicant for the credit cards sent the applications from Rhodes's computer, the expert could not identify whom the applicant was. Also, a prosecutor, on behalf of a law enforcement officer, may subpoena records for an investigation. § 27.04, Fla. Stat. *State v. Investigation*, 802 So. 2d 1141, 1143–44 (Fla. 2d DCA 2001). Consequently, the records were not "improperly generated in response to police investigatory action." (Doc. 13-4 at 235) Lastly, in his post-conviction motion, Jimenez neither identified an expert who could have testified that the applications originated from Rhodes's computer nor presented an affidavit or testimony to substantiate that testimony. (Doc. 13-4 at 207–08) Because Jimenez's ineffective assistance of counsel claim was speculative, the state court did not unreasonably deny the claim. *Sullivan v. DeLoach*, 459 F.3d 1097, 1109 (11th Cir. 2006) ("This prejudice burden is heavy where the petitioner alleges ineffective assistance in failing to call a witness because 'often

allegations of what a witness would have testified to are largely speculative.'") (quoting *United States v. Guerra*, 628 F.2d 410, 413 (5th Cir. 1980)).

Ground Three is **DENIED**.

**Ground Four, Ground Five, and Ground Six**

Jimenez asserts that the trial court erred by relying on summaries of witness testimony, instead of live witness testimony, to determine that the similar fact evidence was admissible at trial and by allowing the similar fact evidence to become a feature at trial. (Docs. 6 at 10 and 7 at 4–6) ("Substantive Claim") He further asserts that the similar fact testimony both included communications protected by the marital privilege and became a feature at trial (Doc. 6 at 10, 12–13), and trial counsel was ineffective for failing to challenge the admission of the testimony on these grounds. (Doc. 7 at 4–6, 16–20) ("Ineffective Assistance of Counsel Claim")

**Substantive Claim**

Jimenez asserts that the trial court erroneously relied on summaries of witness testimony, instead of live witness testimony, to conclude that similar fact evidence was admissible at trial and erroneously allowed the similar fact evidence to become a feature at trial. (Docs. 6 at 10 and 7 at 4–6) The prosecutor notified the defense of its intent to introduce testimony by Elizabeth Gonzalez as similar fact evidence at trial (Doc. 13-2 at 21–23), and the defense moved to exclude the similar fact evidence. (Doc. 13-2 at 25–27) The trial judge heard testimony by live witnesses at a hearing (Doc. 13-2 at 59–107, 129–51) and denied the defense's motion as follows (Doc. 13-2 at 168–70):

> This cause came to be heard on May 17, 2013 and June 7, 2013 on the State of Florida's Notice of Intent to Use Evidence of Other Crimes, Wrongs, or Acts Committed by the Defendant filed [ ] on May 10, 2010. The Defendant filed a Motion to

Exclude "*Williams* Rule" Testimony on December 7, 2010. Based upon the testimony and other evidence presented, the legal arguments presented by the parties, and the controlling legal authority cited, the Court reaches the following conclusions of law:

*Relevant Case History & Allegations of the Charged Crime[s]*

On March 26, 2010 an Amended Felony Information was filed charging the Defendant, David Jimenez, with four offenses; Scheme to Defraud, two counts of Criminal Use of Personal Identification Information and Providing False Name to Law Enforcement. The alleged victim of the first three offenses is Sandra Rhodes. It is alleged that the Defendant met Ms. Rhodes through an internet dating website, began a romantic relationship with her[,] and then engaged in [a] scheme to defraud her. Mr. Jimenez allegedly opened and used credit card accounts in her name without her knowledge. He also allegedly deceived Ms. Rhodes into purchasing a car. The testimony and evidence presented at [the] hearing establishes the Facts Involving the Charged Offenses set forth in the State's Memorandum of Law in Support of Similar Fact/Inextricably Intertwined Evidence filed herein.

*Williams Rule Evidence*

In *Williams v. State*, 110 So. 2d 654, 659–60 (Fla. 1959), the Florida Supreme Court enunciated the rule regarding the admission of similar crime evidence: "Our view of the proper rule simply is that relevant evidence will not be excluded merely because it relates to similar facts which point to the commission of a separate crime. The test of admissibility is relevancy. The test of inadmissibility is a lack of relevancy." In other words, evidence of any facts relevant to a material fact in issue except where the sole relevancy is character or propensity of the accused is admissible unless precluded by some specific exception or rule of exclusion.

*Williams* has been codified in § 90.404(2)(a), Fla. Stat. (2006) which provides:

> Similar fact evidence of other crimes, wrongs, or acts is admissible when relevant to prove a material fact in issue, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or

> absence of mistake or accident, but it is inadmissible when the evidence is relevant solely to prove bad character or propensity.

To minimize the risk of a wrongful conviction, the similar fact evidence must meet a strict standard of relevance. *Heuring v. State*, 513 So. 2d 124 (Fla. 1987). The relevance of collateral crime evidence is often a function of similarity. *McLean v. State*, 934 So. 2d 1248 (Fla. 2006); *Williams v. State*, 621 So. 2d 413 (Fla. 1993). To be legally relevant to show identity, it is not enough that the factual situations sought to be compared bear a "general similarity" to one another. Rather, the situations must manifest "identifiable points of similarity." *Wright v. State*, 473 So. 2d 1277, 1281 (Fla. 1985). However there is no requirement that the collateral crime [ ] be absolutely identical to the crime charged. *Chandler v. State*, 702 So. 2d 186, 193 (Fla. 1997). However, when evidence of a collateral crime is admitted to prove intent and knowledge, there is no requirement that the two crimes share unique factors, as there is when the collateral crime is introduced to establish identity. *Tannihill v. State*, 912 So. 2d 2 (Fla. 4th DCA 2005); *Washington v. State*, 737 So. 2d 1208 (Fla. 1st DCA 1999).

Evidence is admissible under § 90.404(2)(a) when it is probative to show intent, which generally is an ultimate issue in the case. *Damren v. State*, 696 So. 2d 709 (Fla. 1997); *Jensen v. State*, 555 So. 2d 414 (Fla. 1st DCA 1990). *See Bradley v. State*, 787 So. 2d 732, 741–42 (Fla. 2001); *Pausch v. State*, 596 So. 2d 1216, 1219 (Fla. 2d DCA 1992). Evidence of similar acts that contradict an innocent explanation of the Defendant's act is admissible. *Wuornos v. State*, 644 So. 2d 1000, 1006–07 (Fla. 1994); *Worden v. State*, 603 So. 2d 581, 583 (Fla. 2d DCA 1992).

However, similar fact evidence that the defendant committed a collateral crime is inherently prejudicial because it creates the risk that a conviction will be based on the defendant's bad character or propensity to commit crimes, rather than on proof that he committed the charged offense. Before allowing *Williams* rule evidence to be presented to the jury, the trial court must find that the State has proved that the defendant committed the collateral acts by clear and convincing evidence. *State v. Norris*, 168 So. 2d 541, 543 (Fla. 1964); *Henrion v. State*, 895 So. 2d 1213, 1216 (Fla. 2d DCA 2005). Further, in order to reduce the risk that the jury will convict based on the defendant's bad character, the State cannot make the collateral act a feature of the trial. *Steverson v. State*, 695 So. 2d 687, 689

(Fla. 1997) "The prosecution should not go too far in introducing evidence of other crimes. The state should not be allowed to go so far as to make the collateral crime a feature instead of an incident." *Randolph v. State*, 463 So. 2d 186, 189 (Fla. 1984).

*The Collateral Acts*

As similar fact evidence it is alleged that during the same general time frame, Mr. Jimenez met Elizabeth Gonzalez and began a romantic relationship with her and then engaged in a similar scheme to defraud her. Mr. Jimenez allegedly opened and used credit card accounts in her name without her knowledge. The testimony and evidence presented at [the] hearing establishes the similar fact evidence set forth in the State's Memorandum of Law in Support of Similar Fact/Inextricably Intertwined Evidence filed herein. This trial court finds that the State has established that the defendant committed these collateral acts by clear and convincing evidence.

*Conclusion*

The allegations of the present charged crimes and the facts of the collateral acts share similarities. The similarities are pervasive, and the dissimilarities insubstantial. There is no requirement the collateral acts be absolutely identical to the crime charged. It has been established by clear and convincing evidence that the defendant committed the collateral acts. The evidence of the collateral acts are (sic) relevant to prove plan and intent. The evidence of the collateral crime is probative and evidence of the collateral crime is not substantially outweighed by the prejudicial effect. The "*Williams* Rule" testimony of one witness as to the collateral acts may be admitted at trial. This Court will not permit the testimony of any other "*Williams* Rule" witness or testimony of any other crime or act. The *Williams* Rule evidence will not become a feature of the trial. The Office of the State Attorney is directed to make only incidental mention of the *Williams* Rule evidence in closing argument.

Whether Gonzalez's testimony was admissible as similar fact evidence is an issue of state law, and a state court's determination of state law receives deference in federal court. *Machin*, 758 F.2d at 1433. At the pretrial hearing, the trial court heard live testimony by

Rhodes and Gonzalez and admitted into evidence records from credit card companies. (Doc. 13-2 at 51, 58) Rhodes testified that she and Jimenez started dating in February 2008, and Jimenez applied for credit cards in her name without her permission or knowledge. (Doc. 13-2 at 61–76) Gonzalez testified that she met Jimenez in March 2008 and married Jimenez in July 2008, and Jimenez applied for credit cards in her name without her permission or knowledge. (Doc. 13-2 at 86–99)

The prosecutor proved the collateral crimes by clear and convincing evidence with Gonzalez's testimony corroborated by the records from the credit card companies. *Hernandez v. State*, 16 So. 3d 336, 340 (Fla. 4th DCA 2009) ("To meet the clear and convincing standard, '[t]he evidence must be credible; the memories of the witnesses must be clear and without confusion; and the sum total of the evidence must be of sufficient weight to convince the trier of fact without hesitancy.'") (citation omitted). Jimenez committed the collateral crimes at the same time as the charged crimes, against the same type of victim as the charged crimes, using a strikingly similar method to defraud the victim as the charged crimes. *DeLuise v. State*, 72 So. 3d 248, 251 (Fla. 4th DCA 2011), *receding on other grounds by Noel v. State*, 127 So. 3d 769 (Fla. 4th DCA 2013) ("The testimony pertaining to the *Williams* rule victims qualified as admissible similar fact evidence because this evidence involved conduct strikingly similar to that committed in the schemes against the victims named in the information.").

The trial judge took steps to prevent the similar fact evidence from becoming a feature at trial. Before the admission of Gonzalez's testimony at trial, the trial court instructed the jury as follows:

> [Court:]          Ladies and gentlemen, I'm going to read
>                   this to you, and I would ask you to read

> along with me. When each of you get a copy, that's your copy to keep.
>
> Okay. I'm going to read it to you. If you would read along with me.
>
> Evidence of other crimes, wrongs, or acts, *Williams* rule.
>
> The evidence you are about to receive concerning evidence of other crimes, wrongs, or acts allegedly committed by the defendant will be considered by you for the limited purpose of proving intent or plan on the part of the defendant, and you shall consider it only as it relates to those issues.
>
> However, the defendant is not on trial for a crime, wrong, or act that is not included in the information; that is, included in the charging document in this case.

(Doc. 13-3 at 314–15). During the final charge to the jury, the trial court read the same instruction. (Doc. 13-3 at 569) § 90.404(2)(d)(2), Fla. Stat.

During closing argument, the prosecutor told the jury that Jimenez used the credit cards in Rhodes's name to purchase items, meals, and vacations for Gonzalez. (Doc. 13-3 at 497–507, 541–48) The prosecutor referenced the limiting instruction and told the jury not to consider Gonzalez's testimony as propensity evidence (Doc. 13-3 at 508):

> [Prosecutor:]  And Elizabeth Gonzalez, her testimony — and I want to be very clear. You all heard the *Williams* Rule instruction, and the Judge is going to read it to you again. And don't use Elizabeth Gonzalez's testimony to say that this defendant has a propensity to commit these types of crimes. Don't do that. That's not what it's for. But what we do want you to use it for is to show his intent and his plan with Sandra Rhodes. That's why Elizabeth

Gonzalez's testimony is important. That's why it's part of that scheme, part of that plan.

Look at the similarities between the two women: Both single mothers; English is their second language; they both have very good credit — their credit didn't get messed up until after this businessman that [the] defense is saying swooped in and helped them — that's when their credit got messed up.

They were both easily manipulated quite frankly. They fell for it. But that doesn't mean they can't be victims because they fell for his lies, and they bought into it because he was a really good liar. He was able to develop these whirlwind relationships with them, and that's how he got access to their personal information.

In both cases he kept his finances very private. Especially with Sandra Rhodes, he had the key for the mail. And with Elizabeth Gonzalez, you know, she said it was just part of, you know, her upbringing and stuff. It was private. She let his stuff be. She wasn't rifling through his mail or his paperwork. Remember, she said that it was kind of strange after this all came to light. She was looking around for his stuff. He didn't really have much financial documents around. She did find all of those credit cards and bank cards in his wallet, but he didn't really have a bunch of statements and stuff like that lying around. Everything about him was very secret, including his job doing confidential things at Lockheed Martin.

So you heard from Elizabeth Gonzalez who doesn't even know Sandra Rhodes. They saw each other kind of sitting in the hall. They didn't know each other. They come in and give you a very similar story

> of this romance, and I submit to you that the similarities between their cases, that corroborates what Sandra Rhodes said, and that lends credibility to Sandra Rhodes's story about how he wrapped her in and manipulated her. And that's the purpose of Elizabeth Gonzalez's testimony.

Because the prosecutor proved the similar fact evidence by clear and convincing evidence, the collateral crimes against Gonzalez were strikingly similar to the charged crimes against Rhodes, the trial court gave the jury two limiting instructions concerning the similar fact evidence, and the prosecutor appropriately referred to the similar fact evidence in closing argument, the state court did not unreasonably deny Jimenez's claim. *Dowling v. United States*, 493 U.S. 342, 353 (1990).

The substantive claim is **DENIED**.

**Ineffective Assistance of Counsel Claim**

Jimenez asserts that trial counsel was ineffective for not challenging the admission of the similar fact evidence ("sub-claim A") and for not asserting the marital privilege over Gonzalez's testimony ("sub-claim B").

**Sub-claim A**

The post-conviction court denied Jimenez's claim that trial counsel was ineffective for not challenging the admission of the similar fact evidence as follows (Doc. 13-4 at 231–33, 242–43) (state court citations omitted):

> Defendant asserts that his counsel was ineffective for failing to object to the State's notice of intent to use *Williams* Rule evidence, and for failing to challenge the admissibility of *Williams* Rule testimony. Defendant asserts that the testimony sought to be introduced was never detailed, and because counsel was not given an opportunity to cross-examine Ms. Gonzalez, counsel was unaware what the State would elicit

from her and unprepared to argue the balancing test required to determine the admissibility of *Williams* Rule evidence. Defendant asserts that Ms. Gonzalez was proceeding with a divorce from Defendant and "the testimony of a 'scorned woman' was certain to discredit [Defendant] and show him to be a 'bad actor.'" He asserts that he provided her with a Mercedes Benz in her name, that he did not ask her to work, that he intended to provide for her needs, and alleges that nothing about his conduct toward Ms. Gonzalez proves that he intended to defraud her. Defendant asserts that but for counsel's deficiency in failing to challenge or object to the admissibility of Ms. Gonzalez's *Williams* Rule testimony, the outcome of the proceeding would have been different.

As an initial matter, Defendant claims that the testimony sought to be introduced was never detailed, and because counsel was not given a chance to cross-examine Ms. Gonzalez, he was unaware of what the State would elicit from her. However, as Defendant's motion admits, Ms. Gonzalez was deposed shortly before the State filed its *Williams* Rule motion. Further, contrary to Defendant's allegation, defense counsel did cross examine Ms. Gonzalez at the *Williams* Rule hearing.

Notwithstanding, Defendant is not entitled to relief because counsel was not deficient. Contrary to Defendant's allegation, counsel repeatedly objected to the State's notice of intent to use *Williams* Rule evidence and did challenge its admissibility, because he filed a Motion to Exclude *Williams* Rule Testimony on December 7, 2010, long before his *Williams* Rule hearing took place in 2013. In his motion, counsel argued that the *Williams* Rule evidence requires that there be some similarity or uniqueness between the crime charged and the evidence of the collateral crime, and that any uniqueness or similarity in this case is outweighed by differences or dissimilarities in the way the crimes were carried out. Further, at the *Williams* Rule hearing, counsel did cross-examine Ms. Gonzalez, and elicited testimony from her that Defendant had purchased a Mercedes, that he had furnished an apartment, that she was not working at the time, and that Defendant took care of all the household expenses, as he describes in his motion. Additionally, after the *Williams* Rule hearing took place, counsel filed a memorandum of law in support of his motion to exclude [the] *Williams* Rule testimony, in which he summarized the testimony, explained the "balancing test" Defendant references regarding the *Williams* Rule and inextricably intertwined evidence, and

analyzed the proposed *Williams* Rule evidence. Counsel argued that Ms. Gonzalez's testimony was not inextricably intertwined and therefore inadmissible and was relevant solely to show bad character or propensity. Despite counsel's repeated challenges to the admissibility of Ms. Gonzalez's testimony, the Court ruled that the testimony was admissible. Finally, counsel again objected to the use of [the] *Williams* Rule testimony at trial, stating that he was not waiving his previous objection to the introduction of *Williams* Rule evidence, and specifically stated that he was renewing his objection for the purposes of appeal, but the objection was overruled. Thus, counsel was not deficient because he did object to the admission of the *Williams* Rule evidence. Because counsel was not deficient, the Court need not address prejudice. *See Maxwell*, 490 So. 2d at 932. This claim is denied.

. . .

Defendant states that "[c]ounsel failed to properly isolate the Court's claim that [Ms. Gonzalez's] testimony was intertwined with that of Ms. Rhodes." While Defendant's argument is unclear, the Court interprets Defendant's claim to assert that counsel was ineffective for failing to challenge that Court's ruling as to the admissibility of Ms. Gonzalez's testimony pursuant to the *Williams* Rule. He argues that the testimony "does not even approach the finding of 'inextricably intertwined.'" He claims that Ms. Gonzalez was biased because her divorce from Defendant was pending, because she was seeking to gain the upper hand in contested custody proceedings over their child, and because Ms. Gonzalez feared that she would be arrested for fraud, and her testimony was only used to prove bad character. He alleges that but for counsel's deficiency, the outcome of the trial would have been different.

Defendant is not entitled to relief because counsel was not deficient. As discussed above, counsel challenged the State's argument that the testimony of Ms. Rhodes and Ms. Gonzalez was inextricably intertwined by filing a motion to exclude *Williams* Rule evidence and a memorandum in support of his motion. Additionally, he again objected to the introduction of *Williams* Rule at trial, and the objection was overruled. Finally, counsel was not deficient because he also preserved his objection to the *Williams* Rule evidence for appellate review by obtaining a pretrial ruling on the admissibility of the evidence. *See McWatters v. State*, 36 So. 3d 613, 627 (Fla. 2010) (finding that the defendant had preserved his *Williams* Rule objection for

review by obtaining a pretrial ruling on the admissibility of the evidence) (citing § 90.104(1), Fla. Stat.) (providing that pretrial ruling on admissibility of evidence preserves objection for appellate review)). Counsel also specifically included the granting of the State's motion for *Williams* Rule evidence in his Statement of Judicial Acts to be Reviewed. Thus, as Defendant has failed to demonstrate that his counsel was deficient, the Court need not address prejudice. *See Maxwell*, 490 So. 2d at 932. This claim is denied.

. . .

Defendant's claim again alleges that counsel was ineffective "for failing to challenge his written objection to the *Williams* Rule evidence and failing to object to its admission at trial." Defendant first admits that his counsel did file a written objection and also objected to the admission of testimony of Ms. Gonzalez at trial, and states that the Court entered an order permitting the evidence and acknowledging that the issue was preserved for trial. He then states that counsel was ineffective for failing to "challenge written objection to the *Williams* Rule inextricably intertwined evidence and objected to admission of testimony from [Ms. Gonzalez], preserved for trial," and "failing to present that the testimony provided by [Ms. Gonzalez] was inadmissible to the [C]ourt." He argues that counsel was ineffective for failing to present the ruling in *Rolle v. State*, 37 Fla. L. Weekly D1920 (Fla. 2nd DCA 2012), under which "the Sixth Circuit is bound inadmissibility of [*Williams*] Rule evidence by the 2nd DCA." Defendant alleges that without the *Williams* Rule evidence, the evidence of Ms. Rhodes would have been insufficient to convict him.

Defendant's claim is unclear, as Defendant contradicts himself within his claim. He argues that counsel was ineffective for failing to challenge or object to *Williams* Rule witness Ms. Gonzalez, and for failing to allege that her testimony was inadmissible, but in the same claim acknowledges that counsel both filed a written objection to the *Williams* Rule evidence and objected to the evidence at trial. However, based on Defendant's argument surrounding *Rolle*, it appears that Defendant is arguing that the holding in *Rolle* precludes the admission of any *Williams* Rule evidence in cases arising out of the Sixth Circuit, and counsel was ineffective for failing to advise the Court of the ruling. However, the Court in *Rolle* found on direct appeal that, in that case, the victim's testimony that the defendant had touched her sexually in Pembroke Pines

was not necessary in order to understand her testimony that the defendant touched her sexually in Clearwater, and the trial court abused its discretion by allowing such testimony. *Rolle v. State*, 93 So. 3d 1230, 1231 (Fla. 2d DCA 2012). The holding in *Rolle* does not preclude the use of all *Williams* Rule evidence in the Sixth Circuit. Further, the instant case is distinguishable from *Rolle*, because, as described above, this Court held a *Williams* Rule hearing prior to trial specifically to determine the admissibility of [the] *Williams* Rule testimony, and the testimony was found to be relevant to prove plan and intent, and was therefore admissible. Thus, even if counsel had presented the Court with the holding in *Rolle*, there is no reasonable probability that it would have changed the Court's ruling, because the holding in *Rolle* does not preclude *Williams* Rule evidence in the Sixth Circuit. This claim is denied.

Trial counsel moved to exclude the similar fact evidence before trial. (Doc. 13-2 at 25–27) At the pretrial hearing on the motion, trial counsel cross-examined Rhodes, Gonzalez, and the detective. (Doc. 13-2 at 51, 127) After the hearing, trial counsel filed a memorandum and argued that Gonzalez's testimony was neither similar fact evidence nor inextricably intertwined evidence and only relevant to prove Jimenez's bad character and propensity to commit the charged crimes. (Doc. 13-2 at 156–63) At trial, trial counsel renewed the motion and asked for the limiting instruction both before Gonzalez's testimony and during the final charge. (Doc. 13-3 at 290–95, 486) Because the state court record supports the post-conviction court's denial of the claim, the state court did not unreasonably deny the claim.

Sub-claim A is **DENIED**.

**Sub-claim B**

The post-conviction court denied the claim that trial counsel was ineffective for not claiming the martial privilege over Gonzalez's testimony as follows (Doc. 13-4 at 272–78) (state court record citations omitted):

> Defendant argues that counsel was ineffective for waiving his marital privilege at his *Williams* Rule hearing and at trial. Defendant asserts that counsel failed to exercise his absolute privilege to prevent Ms. Gonzalez from revealing confidential marital communications at pretrial hearings or at trial itself. He asserts that the State "blurred the proffer of testimony to make unclear whether the information provided by [Ms. Gonzalez] was the result of confidential communication between [Ms. Gonzalez] and [Defendant] or whether the conversations had occurred after the marriage." Defendant asserts that "all credit applications were pre-agreed to be subsequently ratified within the confines of the confidential marital relationship." Defendant argues that under the evidentiary rule, he is the holder of the marital privilege, and only he could waive it. Defendant asserts that he was prejudiced because Ms. Gonzalez's testimony, which he asserts was precluded by marital privilege, was admitted at trial without objection by counsel. Defendant asserts that "the bulk" of Ms. Gonzalez's testimony was precluded by marital privilege, and points to specific pages in the trial transcript that contain testimony he asserts is precluded by privilege on pages 4 and 5 of his third amended motion. Defendant asserts that if the proper objections had been made, Ms. Gonzalez's testimony would have been determined to be inadmissible at trial and the outcome of the proceedings would have been different. The State was directed to respond to this claim.

> In its response, the State alleges that counsel was not deficient for failing to object to Ms. Gonzalez's testimony at the *Williams* Rule hearing or at trial because her testimony fell within an exception to marital privilege. The State argues that under Section 90.504(3)(b), Florida Statutes, there is no privilege "in a criminal proceeding in which one spouse is charged with a crime committed at any time against the person or property of the other spouse, or the person or property of either." The State asserts that Ms. Gonzalez's testimony was presented as similar fact evidence of a collateral crime, and although Defendant was not charged with a crime against Ms. Gonzalez, he still

committed a crime against Ms. Gonzalez, his wife at the time. The State asserts that refusing to apply the exception to marital privilege would "protect marital harmony to the detriment of the spouse that it is trying to protect." Therefore, the State argues that counsel's failure to object to Ms. Gonzalez's testimony as privileged was objectively reasonable because it fell within the exception to marital privilege under Section 90.504(3)(b), Florida Statutes.

Further, the State asserts that even if the exception did not apply and Defendant could assert his marital privilege, only portions of Ms. Gonzalez's testimony could be redacted. Ms. Gonzalez testified that she met Defendant in March of 2008, and shortly thereafter he took her to dinner at Carrabba's, met her at Disney, purchased airfare and stays at hotels, all using credit cards in Ms. Rhodes's name. She testified that they married on July 2, 2008 in Puerto Rico, and on that date, marital privilege applied, but the testimony regarding communications between Ms. Gonzalez and Defendant before that date was not privileged. Therefore, the State argues that Ms. Gonzalez's testimony regarding the purchases Defendant made on credit cards in Ms. Rhodes's name prior to the marriage was still admissible, and would have been enough evidence for a reasonable jury to find Defendant guilty. Therefore, the State asserts that Defendant failed to prove the prejudice prong of *Strickland*.

The Court finds that Defendant is not entitled to relief. Pursuant to Section 90.504(1), Florida Statutes, a party to a valid marriage may refuse to disclose and prevent his or her spouse from disclosing confidential communications between the spouses made during the marriage. "Either party can invoke the privilege and refuse to disclose or prevent another from disclosing those communications." *Pagan v. State*, 29 So. 3d 938, 958 (Fla. 2009). However, there are three exceptions, during which the marital privilege does not apply. *See* § 90.504(3), Fla. Stat. Under Section 90.504(3)(b), Florida Statutes, there is no privilege in a criminal proceeding "in which one spouse is charged with a crime committed at any time against the person or property of the other spouse." Here, marital privilege does not apply, because Ms. Gonzalez's testimony that Defendant used her personal identification information to open up credit cards in her name without her permission was presented as similar fact evidence of a collateral crime that Defendant had committed against her. *See id.*

32

Moreover, even if Ms. Gonzalez's testimony did not fall under the exception identified in Section 90.504(3)(b), Florida Statutes, counsel was not deficient for failing to object to Ms. Gonzalez's testimony because her trial testimony and *Williams* Rule testimony does not violate [the] marital privilege; the privilege would only apply to confidential communications made between Defendant and Ms. Gonzalez while they were married, and would not apply to communications made while they were not married. *See State v. Norris*, 352 So. 2d 875, 877 (Fla. 3d DCA 1977). Further, marital privilege would not extend to Defendant's actions. *See Kaczmar v. State*, 104 So. 3d 990, 999 (Fla. 2012) (citing *Kerlin v. State*, 352 So. 2d 45, 51–52 (Fla. 1977)) (finding the privilege extends only to communications, not to acts which are in no way communications).

In the instant case, Ms. Gonzalez testified at trial that she first met Defendant in March of 2008, and they later married on July 2, 2008; therefore, marital privilege would not apply to Ms. Gonzalez's testimony relating to actions or communications that occurred between March of 2008 and July 2, 2008. *See id.* On pages 4 and 5 of his third amended motion, Defendant points to Ms. Gonzalez's testimony at trial that she did not give Defendant permission to spend her money, her testimony that she looked through Defendant's things, and her testimony stating that Defendant was always using credit cards and signing his name. Defendant further cites to Ms. Gonzalez's testimony regarding when she discovered the fraudulent credit cards, and her testimony that she did not consent to or have knowledge that the credit cards had been opened in her name. However, her testimony revealed that the credit card accounts were opened prior to the marriage. Thus, none of the testimony specifically cited to by Defendant relates to confidential communications made between Defendant and Ms. Gonzalez while they were married and is therefore not privileged. *See Norris*, 352 So. 2d 875, 877; *Kaczmar*, 104 So. 3d at 999.

Defendant's motion then goes on to broadly allege that, in addition to the testimony he cites, "the bulk of [Ms. Gonzalez's] testimony from T-315 to 371" was precluded. To that end, the bulk of Ms. Gonzalez's testimony related to Defendant's actions and events that occurred prior to their marriage and are therefore not precluded by privilege. *See Norris*, 352 So. 2d 875, 877; *Kaczmar*, 104 So. 3d at 999. During her direct examination, Ms. Gonzalez testified that she first met Defendant in March of

2008, while she was on vacation visiting her sister, and he gave her his contact information. Ms. Gonzalez testified that she was planning on staying in town for one week, and during that week, Defendant took her and her family to Carrabba's, to Disney, to Wolfgang Puck Cafe, and various other places, and that Defendant always paid. She testified that when she returned to Puerto Rico, they stayed in contact, and Defendant would mail her gifts. Ms. Gonzalez testified that in April of 2008, Defendant tried to come visit her, but it did not work out, but that Defendant sent Ms. Gonzalez's mother a Tiffany and Company ring for her birthday, and arranged for Ms. Gonzalez and her sisters [to] be driven around in a limousine for the day. Ms. Gonzalez testified that in early May of 2008, Defendant paid for her to fly back to Florida for a weekend, paid for her to stay in a nice hotel overlooking the beach, and paid for gifts [and] dinners [at] high-end restaurants. She testified that Defendant drove a black Mercedes, which he represented to be his. Ms. Gonzalez testified that in mid-May of 2008, shortly after she had returned to Puerto Rico, Defendant visited her in Puerto Rico. She testified that while there, Defendant went shopping with her family, bought her flowers and gifts, paid for dinner at a fancy restaurant, and stayed at a nice hotel in a room with a view to the ocean. She testified that Defendant proposed marriage to her during that trip. Ms. Gonzalez testified that after the proposal, she and Defendant discussed moving her to Tampa, and prepared her finances for the move. She testified that when she advised Defendant that she might not be able to get a job in Tampa, he was comforting and told her not to worry about it and that he would take care of everything. This testimony was elicited to demonstrate that Defendant was using Ms. Rhodes's credit cards to fund his relationship with Ms. Gonzalez, and support the State's argument that Ms. Rhodes would never have consented to the use of her information for those purposes, and to support the State's argument that Defendant had a common scheme or plan.

Ms. Gonzalez further testified that prior to the marriage, Defendant returned to Puerto Rico and told her that he had added her to his accounts, and gave her an American Express card to use if she needed anything for her move to Florida. Ms. Gonzalez testified that she did not authorize Defendant to open the account; that she thought that it was his account, and that he was responsible for the payments and she was only a secondary user. Ms. Gonzalez testified that just prior to the marriage, Defendant told her he needed her personal identification information in order to add her and her daughter

to his insurance policy, which she provided because she thought it was a valid reason and they were going to get married. This testimony was elicited to support the State's argument that Defendant had a common scheme or plan as to Ms. Rhodes and to lend credibility to her testimony. Ms. Gonzalez testified that on July 2, 2008, she and Defendant married at a big, high-end resort in Puerto Rico. Because all of testimony recounted above related to actions, communications, and events that occurred prior to the marriage, [and therefore] it is not precluded by marital privilege. *See* § 90.504, Fla. Stat. *See also Norris*, 352 So. 2d 875, 877.

Ms. Gonzalez testified that after she and Defendant married, they moved to Westchase, where she signed a lease for an apartment at Defendant's request, but that Defendant would give her money orders to make the lease payments. Ms. Gonzalez then identified various phone numbers, and testified that she never saw Defendant use cash, only credit cards, and that she saw him signing his name 98 percent of the time. Ms. Gonzalez then identified Defendant's signature on receipts included in the State's exhibits. Ms. Gonzalez testified that while living with Defendant, he would go to the mailbox, and all of the mail was in his name; she did not open mail unless it was a card from a family member or friend in her name.

Ms. Gonzalez's testified that at some point, everything changed, and she received an eviction notice and shortly after, a visit from Detective Bingham notifying her that Defendant was under investigation for fraud. Ms. Gonzalez testified that after learning of the investigation, she checked her credit history and learned that there were multiple credit cards opened in her name that were not hers, with balances of $50[,000 to $]60,000. She testified that she had no knowledge that the cards were opened and did not give anyone consent to use her information to open the accounts. The State then reviewed the various credit card records and the charges they reflected that had been entered as exhibits with Ms. Gonzalez, noting that each account was opened prior to the marriage and that the charges incurred were unauthorized.

Ms. Gonzalez then testified that after Detective Bingham notified her of the investigation, she went through Defendant's things for the first time, locating his wallet with two driver's licenses and several credit cards. She testified that she subsequently ended the relationship by moving to be with family. She explained that she filed for divorce, and was able to

"clear the credit cards" that Defendant opened, but was still paying for the debt incurred by Defendant on her savings account. On cross-examination, Ms. Gonzalez testified that, she did not know whether the credit card statements were being mailed to her and Defendant's apartment, and testified that while married, she did have a car available and furnished home available to her. She testified that she was of the understanding that Defendant worked, and again testified to actions and events that occurred prior to the marriage. Again, a majority of testimony recounted above related to actions, communications, and events that occurred prior to the marriage, it is not precluded by marital privilege. *See* § 90.504, Fla. Stat. *See also Norris*, 352 So. 2d 875, 877. The limited testimony by Ms. Gonzalez that related to events that took place during the marriage, such as her testimony that Defendant retrieved the mail or primarily used credit cards, relates to Defendant's actions during the marriage, and not communications, and is therefore not precluded by marital privilege. *See Kaczmar*, 104 So. 3d at 999.

Finally, the Court notes that while Defendant alleges that counsel failed to object to Ms. Gonzalez's testimony at the *Williams* Rule hearing, he does not identify any specific testimony that counsel should have objected to during that hearing, and cites only to her trial testimony. Notwithstanding, Ms. Gonzalez's testimony at trial was consistent with her testimony at the *Williams* Rule hearing. Thus, her testimony at the *Williams* Rule hearing would not have been precluded by marital privilege for the same reasons as discussed above, and counsel had no basis to object.

In light of the foregoing, Defendant fails to meet either prong of *Strickland*. Counsel was not deficient for "waiving" Defendant's marital privilege or for failing to object to Ms. Gonzalez's testimony as privileged because Ms. Gonzalez did not testify to any confidential communications that occurred during the marriage, and therefore her testimony was not precluded by marital privilege. *See Norris*, 352 So. 2d 875, 877. As is set forth in detail above, Ms. Gonzalez's testimony relates primarily to Defendant's actions and communications that occurred prior to their marriage, which is not precluded by marital privilege. *See Kaczmar*, 104 So. 3d at 999. The limited testimony by Ms. Gonzalez that related to events that took place during the marriage, such as her testimony that Defendant retrieved the mail or primarily used credit cards, relates to Defendant's actions during the marriage and is not

precluded by marital privilege. *See id.* Counsel cannot be deemed ineffective for failing to raise a meritless objection. *See Schoenwetter v. State*, 46 So. 3d 535, 546 (Fla. 2010).

Likewise, Defendant was not prejudiced because if counsel had objected to Ms. Gonzalez's testimony based on marital privilege, the objection would have been overruled because her testimony was not precluded by marital privilege as described above. *See Norris*, 352 So. 2d 875, 877; *Kaczmar*, 104 So. 3d at 999. Further, even if marital privilege applied, all of Ms. Gonzalez's testimony regarding the purchases Defendant made using Ms. Rhodes's credit cards prior to the marriage would still have been admissible at the *Williams* Rule hearing and at trial. *See id.* Further, the record reflects that the credit cards opened in Ms. Gonzalez's name without her consent were opened on June 13, 2008, and May 28, 2008, prior to the marriage, and her testimony regarding the credit cards would still have been admissible. *See id.* Consequently, there is no reasonable probability that the outcome of the trial would have been different if counsel had objected to Ms. Gonzalez's testimony, and this claim is denied.

Whether the marital privilege applies to Gonzalez's testimony is an issue of state law, and a state court's determination of state law receives deference in federal court. *Machin*, 758 F.2d at 1433. At trial, Gonzalez testified that she married Jimenez on July 2, 2008. (Doc. 13-4 at 606) Gonzalez's testimony concerning communications between her and Jimenez before their marriage, including how they met, where they went, what Jimenez told her about his job, what Jimenez told Gonzalez about a credit card that he gave her, and what Jimenez told Gonzalez about his need for her personal identification information, was not protected by the marital privilege. (Doc. 13-4 at 345–67) § 90.504, Fla. Stat. *State v. Norris*, 352 So. 2d 875, 876 (Fla. 3d DCA 1977).

Gonzalez testified that, during the marriage, Gonzalez signed the lease for their new apartment because Jimenez agreed to pay the rent, Gonzalez saw Jimenez almost always use a credit card to pay for everything else, Gonzalez saw Jimenez sign documents and

could identify Jimenez's signature on receipts, and Gonzalez saw Jimenez almost always open the mail. (Doc. 13-4 at 367–73) Gonzalez incurred a large debt in her savings account after she gave Jimenez a card for that account. (Doc. 13-4 at 380–82) The prosecution introduced into evidence records from credit card accounts in Gonzalez's name (Doc. 13-4 at 374–75), and Gonzalez testified that she never knew about the accounts and never allowed anyone to use the accounts for purchases. (Doc. 13-4 at 374–80) Because Gonzalez primarily testified about Jimenez's actions during the marriage corroborated by the records and any communication between her and Jimenez disclosed during the marriage was incidental to those actions, her testimony was not protected by the marital privilege. *Kaczmar v. State*, 104 So. 3d 990, 999 (Fla. 2012).

Those incidental communications included the following. Gonzalez disclosed that, during the marriage, Jimenez was "very pushy" when he asked her to sign the lease and told her that "we're married, and you don't do anything for our relationship." (Doc. 13-4 at 367) Jimenez told her that he wanted them to live at the apartment because her daughter would attend the best schools. (Doc. 13-4 at 368) Gonzalez testified that, when Jimenez demanded the bank card for her savings account, Jimenez told her that he had lost his credit cards and promised to put money in the savings account. (Doc. 13-4 at 381) Also, Gonzalez testified that when she confronted Jimenez about the eviction or other financial problems, "it ended up in an argument and a threat." (Doc. 13-4 at 383)

The prosecution introduced Gonzalez's testimony, corroborated by records from credit card companies, as similar fact evidence to prove intent or plan on the part of Jimenez. (Doc. 13-3 at 315) During closing argument, the prosecutor relied on the romantic relationship between Gonzalez and Jimenez and the credit card accounts that Jimenez

applied for and used without Gonzalez's permission to prove his intent and plan to defraud Rhodes. (Doc. 13-3 at 508–10) Also, unrebutted evidence including records from credit card companies, banks, a telephone company, a website, and an internet provider substantiated the fraud that Jimenez committed against Rhodes. Even if reasonable counsel would have asserted the marital privilege over those peripheral communications between Jimenez and Gonzalez, Jimenez could not demonstrate a reasonable probability that the outcome at trial would have changed. As such, the state court did not unreasonably apply *Strickland*. *Strickland*, 466 U.S. at 694. *Carty v. Thaler*, 583 F.3d 244, 261–62 (5th Cir. 2009).

Sub-claim B is **DENIED**.

Ground Four, Ground Five, and Ground Six are **DENIED**.

**Ground Seven**

Jimenez asserts that the trial court should have excluded Rhodes's testimony concerning her bankruptcy at trial (Docs. 6 at 16–17 and 7 at 21–22), and trial counsel was ineffective for not objecting to the testimony on authenticity and hearsay grounds. (Doc. 7 at 21) The Respondent asserts that the ground is unexhausted and procedurally barred. (Doc. 13 at 8) Jimenez contends that he raised the claim in his motion for post-conviction relief. (Doc. 6 at 16) However, in his post-conviction motion, Jimenez asserted that trial counsel was ineffective for not obtaining bankruptcy records filed by Rhodes. (Doc. 13-4 at 208) Jimenez raised the claim concerning trial counsel's failure to object to Rhodes's testimony for the first time in his brief on post-conviction appeal. (Doc. 13-4 at 542–45) Because a defendant cannot raise a claim for the first time on post-conviction appeal in a Florida court, Jimenez failed to exhaust his available state court remedies. *Mendoza*, 87 So. 3d at 660. *Harris*, 709 F. App'x at 668.

If Jimenez returned to state court to exhaust the claim, the state court would deny the claim as untimely and successive. Fla. R. Crim. P. 3.850(b), (h). Because Jimenez shows neither cause and actual prejudice nor a miscarriage of justice, the claim is procedurally barred from federal review. *Snowden*, 135 F.3d at 736.

Ground Seven is **DENIED**.

**Ground Eight**

Jimenez asserts that trial counsel was ineffective for not raising a viable defense that the criminal charges amounted to a civil dispute arising from a "lover's spat." (Docs. 6 at 17 and 7 at 22–24) The post-conviction court denied the claim as follows (Doc. 13-4 at 238–41) (state court record citations omitted):

> Defendant's claim alleges that his counsel was ineffective for failing to develop a viable defense for Defendant based on a "lover's spat" between the parties. Defendant contends that Ms. Rhodes's claim is "at best" a civil financial dispute. Defendant asserts that although Ms. Rhodes claimed she did not authorize certain credit applications and did not know she was the primary creditor, she ratified the applications by using the credit cards. Defendant claims that his counsel never discussed "the issue" with Defendant and never explored at trial whether Ms. Rhodes ever made a civil demand upon Defendant, which Defendant contends is "a precondition to any civil claim including an action for civil theft." While his claim is unclear, Defendant appears to cite to portions of the record on pages 35 through 44 of his third amended motion which support his proposed defense that this case is a civil financial dispute, because Ms. Rhodes was aware or may have been aware of the accounts opened in her name, and used the accounts herself. He cites to trial testimony where Ms. Rhodes testified that Defendant owed her money, that she told Detective Bingham that she knew Defendant had opened credit cards in her name, that she had purchased State Farm car insurance, food, and gas with the credit cards, and that she had filed for bankruptcy; he asserts that Ms. Rhodes used a Bank of America credit card to enter into a lease agreement for an apartment that Defendant asserts was his residence from March [to] June 2008, he cites to a police report by Deputy Hugo Castillo which indicated that

Deputy Castillo advised Ms. Rhodes that her case was a civil matter, and he cites to deposition testimony from Detective Bingham where the detective stated that Ms. Rhodes told him she knew Defendant had opened several cards. Defendant asserts that a demand must be made upon the party who is claimed to owe repayment, and no demand was made. He asserts that but for counsel's deficiency, the outcome of the trial would be different.

Though Defendant's argument is unclear, it appears that Defendant is arguing that counsel was ineffective for failing to object to criminal charges being brought against him for a case that was only a civil matter, or that counsel was ineffective for failing to argue that Ms. Rhodes knew about the credit card applications and ratified the applications by using the credit cards, which would demonstrate to the jury that her case was a civil financial dispute. To the extent Defendant may be arguing that his counsel was ineffective for failing to object to criminal charges being brought against him for a civil dispute, Defendant's claim is without merit. "Under Florida's constitution, the decision to charge and prosecute is an executive responsibility, and the state attorney has complete discretion in deciding whether and how to prosecute." *State v. Bloom*, 497 So. 2d 2, 3 (Fla. 1986) (citing Art. II, §3, Fla. Const.). Accordingly, charging Defendant criminally was within the State's discretion, and any objection by counsel would have been meritless. Counsel cannot be deemed ineffective for failing to raise a meritless objection. *Schoenwetter v. State*, 46 So. 3d 535, 546 (Fla. 2010).

To the extent Defendant argues that counsel was ineffective for failing to argue that Ms. Rhodes knew about the credit card applications and ratified the applications by using the credit cards, which would demonstrate to the jury that her case was a civil financial dispute, Defendant is not entitled to relief because counsel was not deficient. Counsel did attempt to demonstrate that Ms. Rhodes was aware of the credit cards and applications and argue that the entire case was the result of a financial dispute, or "lover's spat" between Defendant and Ms. Rhodes, who once had a personal relationship. During his opening argument, counsel asserted that Ms. Rhodes met Defendant on an online dating website, and she told Defendant she was a single mother with financial problems, and Defendant offered to help her consolidate the debt through credit cards to address the financial issues. Counsel argued that Ms. Rhodes agreed to apply for the credit cards with Defendant,

and she received copies of the credit cards and used them for personal use. He argued that Defendant helped Ms. Rhodes find a good deal on a used Mercedes, where Ms. Rhodes then went to the dealership where she signed a large number of documents for the purposes of obtaining a loan, and also entered into a lease agreement for an apartment, knowing that she was entering into a financial obligation at Defendant's suggestion.

Counsel then asserted that when Ms. Rhodes realized how much debt she had incurred on the credit card, she contacted the police, and Deputy Hugo Castillo went to speak with her. Counsel argued that at that time, Ms. Rhodes told Deputy Castillo about the credit cards she had applied for with Defendant, that she had signed a stack of loan documents for a car, and that she knew about the cards and the loan. However, at that point, the State objected to counsel's anticipated argument that Deputy Castillo told Ms. Rhodes that it was a civil matter and what she had told him was not criminal. The State argued that Deputy Castillo would not be able to testify regarding his opinion as to whether the instant case was civil or criminal, and further argued that the case is clearly criminal as Defendant was arrested. The objection was well taken, and counsel instead argued that Ms. Rhodes was not satisfied with the result of Deputy Castillo's report, indicating that her claim was a civil matter, so she waited and called the police again and told them that she was not aware of the credit cards or the car loan, and a criminal investigation began. Counsel pointed out that by that time, the relationship between Ms. Rhodes and Defendant was "on the outs" and Defendant was not visiting anymore and was dating another woman, whom he married.

The record reflects that counsel's cross-examination of Ms. Rhodes was consistent with his opening argument. Ms. Rhodes testified that she met Defendant online, that she met with Deputy Castillo and told him that she had signed a car loan agreement and that Defendant gave her credit cards, but after speaking to Deputy Castillo, she understood that he was not going to investigate the case. Ms. Rhodes testified that a few days after meeting with Deputy Castillo, she contacted the police again and spoke with a different deputy, this time telling the deputy that she had not signed credit card applications or a car loan, and her understanding was that a criminal investigation would begin. Notably, Ms. Rhodes testified that she was "looking for a man who will marry [her] and make a family." She admitted that she told Detective Bingham that she

knew Defendant had opened credit card accounts in her name and that she had gone to Tampa to sign car loan documents. Ms. Rhodes testified that she was also aware of American Express and Chase credit cards with her name on it, and used them for food and household needs. Ms. Rhodes testified that she was aware that she had signed an apartment lease agreement in her name, and that it was to her benefit to aid in gaining custody of her child, and the plan was that she and Defendant would both live there.

Further, during his cross-examination of Detective Bingham, the detective testified that Ms. Rhodes had explained to him that Defendant was going to help her with her financial issues, and that she showed him credit card letters and statements. He testified that based on his interview, he learned that none of the bills were a surprise to Ms. Rhodes, that she knew about at least three credit cards: Washington Mutual, American Express, and Capital One, and had been offered assistance with her bills and to obtain credit to be able to purchase groceries. He testified that an American Express account was in Ms. Rhodes's name. He testified that two applications for a Discover credit card were made, and the computer IP address used on the application was never traced back to a computer in Defendant's possession, and no Discover card was issued.

Finally, counsel's closing argument was consistent with his defense that this case was a financial dispute between Defendant and Ms. Rhodes, who once had a personal relationship. He stated that Defendant's relationship with Ms. Gonzalez, whom he married, was different from his relationship with Ms. Rhodes, a woman he met online and "dated for a grand total of four months before she got the message that it was over." He highlighted that Ms. Rhodes was a single mother, who testified that she was looking for a man to support her financially, and took a very deliberate approach in her effort to look for a man who would support her financially. Counsel argued that none of the evidence suggested that Defendant fooled Ms. Rhodes into providing her information, and that she benefitted from having the credit cards, and pointed out that Ms. Rhodes had equal access to the account information. He argued that she was not forced or tricked into leasing an apartment, Ms. Rhodes went to the leasing office with Defendant voluntarily, and signed a lease agreement without reading it. He argued that Ms. Rhodes used an American Express card to pay for an AT&T phone that was

placed in her name, and she had access to those accounts as well.

In light of the foregoing, it is clear that counsel's defense was that Defendant's case was the result of a financial dispute between Defendant and Ms. Rhodes, as Defendant's claim suggests. Accordingly, Defendant has failed to demonstrate that his counsel was deficient. Further, Defendant was not prejudiced because the jury convicted Defendant even after hearing counsel's defense that the case was a financial dispute between the parties. This claim is denied.

Whether the prosecution could charge Jimenez with a crime arising from a civil dispute is an issue of state law, and a state court's determination of state law receives deference in federal court. *Machin*, 758 F.2d at 1433. The information charged Jimenez with a scheme to defraud. (Doc. 13-2 at 18) A plaintiff may sue in a civil action for a monetary loss arising from a criminal charge for a scheme to defraud, and a criminal conviction may estop a defendant from denying the fraudulent conduct in the civil action. *Peterson v. Therma Builders, Inc.*, 958 So. 2d 977, 979–80 (Fla. 2d DCA 2007) (citing § 775.089(8), Fla. Stat.).[3] The two are not mutually exclusive. Because the prosecution appropriately charged Jimenez with a crime under these circumstances, trial counsel was not ineffective and the state court did not unreasonably apply *Strickland*. *Pinkney*, 876 F.3d at 1297.

Also, trial counsel did present a defense at trial that the criminal charges amounted to a civil dispute arising from a "lover's spat." In his opening statement, trial counsel told the jury that Rhodes told Jimenez about her financial problems and Jimenez agreed to help. (Doc. 13-3 at 197) Rhodes agreed to apply for the credit cards, used the credit cards for her own personal expenses, signed documents to purchase the Mercedes Benz, and signed a

---

[3] A plaintiff may demand treble damages, attorney's fees, and costs in a civil action for theft but must send to the defendant a written demand before filing the action. § 772.11(1), Fla. Stat. The written demand requirement does not apply to a criminal action. § 772.11, Fla. Stat.

lease for an apartment. (Doc. 13-3 at 198) Rhodes contacted police only after realizing how much debt she had incurred. (Doc. 13-3 at 198) When trial counsel attempted to tell the jury that a police officer told Rhodes that her complaint amounted to a civil matter, the prosecutor objected. (Doc. 13-3 at 200–01) Trial counsel told the jury instead that the relationship between Rhodes and Jimenez had soured when Rhodes reported the crime to police. (Doc. 13-3 at 201)

During cross-examination of Rhodes, trial counsel elicited testimony that supported this defense. Rhodes admitted that she had incurred significant debt before meeting Jimenez and was "looking for a man who [would] marry [her] and make a family." (Doc. 13-3 at 271) She admitted that she told a detective that she knew about the credit card accounts in her name, the car loan documents that she had signed, and the lease agreement that she had signed for an apartment. (Doc. 13-3 at 272–80) Also, she admitted that she had used the credit cards for her own personal expenses. (Doc. 13-3 at 276–77)

In closing argument, trial counsel presented argument consistent with the defense. Trial counsel told the jury that Rhodes was "a woman that [Jimenez] dated — that he met through Match.com and dated for a grand total of four months before she got the message that it was all over." (Doc. 13-3 at 513–14) Trial counsel pointed out that Rhodes "took a very deliberate approach to this effort to look for a man to support her financially." (Doc. 13-3 at 520) Trial counsel argued that Rhodes could equally access the account information for the credit card accounts and knowingly signed the documents for the car loan and the lease for the apartment. (Doc. 13-3 at 521–27)

Because trial counsel did present a defense at trial that the criminal charges amounted to a civil dispute arising from a "lover's spat" and the state court record refutes Jimenez's claim, the state court did not unreasonably deny the claim.

Ground Eight is **DENIED**.

## Ground Nine

Jimenez asserts that his two convictions for criminal use of personal identification violate double jeopardy. (Doc. 6 at 19–20) The Respondent asserts that the ground is unexhausted and procedurally barred. (Doc. 13 at 14–15) Jimenez did not raise a double jeopardy claim in either his brief on direct appeal (Doc. 13-3 at 627–58) or in his motion for post-conviction relief. (Doc. 13-4 at 175–224) Jimenez raised the double jeopardy claim for the first time in his brief on post-conviction appeal. (Doc. 13-4 at 549–51) Because a defendant cannot raise a claim for the first time on post-conviction appeal in a Florida court, Jimenez failed to exhaust his available state court remedies. *Mendoza*, 87 So. 3d at 660. *Harris*, 709 F. App'x at 668.

If Jimenez returned to state court to exhaust the claim, the state court would deny the claim as untimely, successive, and procedurally barred. Fla. R. Crim. P. 3.850(b), (c), (h). Because Jimenez shows neither cause and actual prejudice nor a miscarriage of justice, the claim is procedurally barred from federal review. *Snowden*, 135 F.3d at 736.

Ground Nine is **DENIED**.

## Ground Ten

Jimenez alleges that "the State willfully deceived the court," and, thereby, committed fraud on the court by introducing into evidence records pursuant to the business records exception, similar fact evidence, the bankruptcy records, and other evidence

concerning what he contends is a civil financial dispute. (Docs. 6 at 14–15 and 7 at 7–8) The More specifically he alleges that "the State willfully deceived the Court and engaged in conduct utterly inconsistent with orderly administration of justice. The admission of this erroneous evidence violated Jimenez's rights to due process and a fair trial. Jimenez's prosecution is unconstitutional." (Doc. 7 at 7) Respondent asserts that the ground is unexhausted and procedurally barred. (Doc. 13 at 8) Jimenez concedes that he did not raise these claims in either his direct appeal or his motion for post-conviction relief. (Doc. 6 at 15) Jimenez raised the fraud on the court claim for the first time in his brief on post-conviction appeal. (Doc.13-4, 551–56) Because a defendant cannot raise a claim for the first time on post-conviction appeal in a Florida court, Jimenez failed to exhaust his available state court remedies. *Mendoza*, 87 So. 3d at 660. *Harris*, 709 F. App'x at 668.

If Jimenez returned to state court to exhaust the claim, the state court would deny the claim as untimely, successive, and procedurally barred. Fla. R. Crim. P. 3.850(b), (c), (h). Because Jimenez shows neither cause and actual prejudice nor a miscarriage of justice, the claim is procedurally barred from federal review. *Snowden*, 135 F.3d at 736.

Ground Ten is **DENIED**.

Accordingly, it is **ORDERED** that Jimenez's amended petition (Doc. 6) is **DENIED**. The Clerk is **DIRECTED** to enter a judgment against Jimenez and **CLOSE** this case.

## CERTIFICATE OF APPEALABILITY AND LEAVE TO PROCEED *IN FORMA PAUPERIS*

Because Jimenez neither makes a substantial showing of the denial of a constitutional right nor demonstrates that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues that he seeks to raise, a certificate

of appealability and leave to appeal *in forma pauperis* are **DENIED**. 28 U.S.C. § 2253(c)(2).

*Slack v. McDaniel*, 529 U.S. 473, 478 (2000).

     **DONE AND ORDERED** in Tampa, Florida on November 19, 2021.

 

 

                                  _____
                                  MARY S. SCRIVEN
                                  UNITED STATES DISTRICT JUDGE